Good morning, your honors, may it please the court, as indicated, I'm Jim Matthews. My privilege to be representing a set of appellants in a portion of the Catlett case, which is 4466, and then also the appellants in Stewart 4457. Judge Mora, what we would like to do with your consent would be to reserve eight minutes for rebuttal. That will be presented by one lawyer. And then the balance, the 22 minutes initially here, will be divided by myself and counsel for the teen appellants in 3021. Great. There's only one provision we're talking about here, right? I covered a lot more ground than that. In the next hour, you're going to hear the two words, paragraph 14, far too many times. All right, well, you don't have to use the whole hour. Where do I go from that, right? Well, if I may, though, I at least will give us a little bit of structure to what we're dealing with. As I indicated to you, my office, together with Attorney Scholl, we're privileged to be representing quite a handful of landowners. We represent roughly 91 landowners. Those landowners are in Carroll County, Ohio and Noble County, Ohio. And they have land that encompasses roughly 5,000 to 6,000 acres in those particular counties. It's not in dispute here that we're all dealing with Ohio law. And one thing, Your Honor, that you won't hear, I'm sure, from us is much dispute as to the contract law that's generally applicable here. We don't need to rehash that black letter law for you. But what we have on this- You're saying there is not much dispute? There is not much dispute. Okay. We know that all of the issues about when you construe ambiguity, when you don't, how it's construed, that's exactly right. Okay. So we need to just move on to the substance. The substance is the form of this Anschutz lease with the infamous paragraph 14 in it. The Anschutz leases that are in the record range from roughly 2008 through a period in 2010. And those leases set forth a primary term that ranges from three years and some of them have a five-year primary term. Are the various cases involving the primary term or are some cases involving situations beyond the primary term? Judge Moore, there are occasions here, and it's not delineated in the record for you, but there are circumstances where some of the leases have been extended, where the primary term has been extended for the additional like period of time. I can give you one example, for instance. That's exactly what's applicable in the Stewart's scenario. The Stewart's had an Anschutz lease that was in place for an initial primary term of three years from 2008 to 2011. And Chesapeake did, under paragraph 4, elect to extend that primary term. And in that particular record, and this is what gets important in terms of our analysis of paragraphs 3, 4, and then 14. In the Stewart example, it was near the end of the initial primary term when the Stewart's obtained an offer to lease the property to another entity. They then believe, like all of the appellants in these cases believe, that paragraph 4 is structured to give them a benefit, to specifically allow them to approach another entity and obtain an acceptable bona fide third-party offer to lease their territory, and then follow the procedures, which is a protective measure for Chesapeake. Follow the procedures outlined in paragraph 14 to extend the right of first refusal to Chesapeake. Well, we're talking about 4 and 14. I mean, do you mean to be talking about both, or did you get them mixed up just now? No, 4 in the Stewart case is that that was exercised as an extension of the primary term. Right. I will emphasize for you that... So in that case, the lessee exercises that right under paragraph 4. Yes, Judge. But you're saying, meanwhile, the lessor solicits or obtains another offer. Correct. The important thing there is all of the leases are in the primary term. It doesn't matter if you're in the initial primary term or the extension of primary term. You're in the primary term. Okay. And, in fact, in the complaint that Chesapeake filed in the main Catlett case, Chesapeake acknowledged in paragraph 111 of the complaint directly that all of the leases in question in this case are in a primary term. It's essential to understand that because when we look at paragraph 14, the introductory clause to paragraph 14 is triggered if during the course of or the timeframe of primary term an offer is obtained by the landowners. Ergo what is the issue, though, in this case? Correct. And what we have done and what we did in the briefing in this case is use a, quite frankly, a simple chart method that we thought was best to portray how 14 operates literally. If I may just interject before you get on to that different subject, just to wind up your illustration with the stewards, I think you said. That's right. So the lessee exercises its paragraph 4 right to extend. Third-party offer comes in. And I presume your position is that at that point the lessor, notwithstanding the extension, is entitled to end the lease. The effect is to terminate the lease if Chesapeake does not exercise its right of first refusal and match. That's exactly our position. And I'll emphasize it again. I don't want to be redundant, but it does not make a difference whether you're in the initial primary. I mean, where I'm going with that, and we'll talk more about it later, is what's the practical import of some of these paragraphs under your reading of 14. But having said that, just go ahead with what you want to talk about. Just so I'm clear also, the primary term is, let's assume the three years, is only the six years. Delay payments, extension payments, all of the other things, you are not denominating primary term. Well, in this particular instance, we are dealing with paid-up leases, so essentially all of the delay rental was paid up front for the initial primary term. And then in those instances where there's been the extension of the primary term, that money has been paid again. See, that's my question. The primary term as you are defining it is not more than the two time periods, the first one and the extension. And any of the other provisions to continue the lease, you are not denominating primary. I should add one other thing to the analysis. It is our position there's another protection mechanism built into these leases. How does one in the position of Chesapeake or its predecessor, Anschutz, avoid implicating paragraph 14? You get the leases out of the primary term. And paragraph 3 expresses how you do that. You do that by following advancing Ohio's public policy to produce oil and gas so that landowners realize the benefit of the royalties in their leases. If, in fact, there had been wells drilled and produced, it removes the lease from the primary term. When you read paragraph 3, you'll see there are about four sentences broken out by a comma. It expresses a primary term, which is a fixed duration. It then uses and so long thereafter or or so long thereafter under some circumstances. The most important clause, Your Honors, is when you pick up after the comma there and you have or as long as a well capable of production is on the property. So in other words, if you strike out what I believe is irrelevant information in there, you have a primary term or as long as a well capable of production. And that's typical. It's standard in the industry. It's common among the law in oil and gas that after you have production, you are no longer in the primary term. Here, however, again. Even if you have production during the three-year primary term, you are no longer in the primary term once there's production? Correct. You've moved the lease to a secondary term not only as a function of law and the standard in the industry, but under paragraph 3 language. It's written in the disjunctive or after a comma. It's not that you can have a primary term and you're also producing. You have your primary term of three years or so long as a well. And that clause, by the way, when you read it, is not used thereafter. This is the first time I've thought about this, so I apologize if I'm going to sound dumb. But paragraph 3 says this lease shall remain in force for a primary term of three years or for as long as a well capable of production. Why does that terminate the primary term early if there's a well that's producing earlier? Sure, Jim. If you look at the two preceding clauses divided by commas, it speaks to thereafter. There there are events where you have the three years and then periods thereafter by certain conduct. Here you have the word thereafter conspicuously absent from the provision dealing with a well. So you have it read, and this is my proposition, that you have a period of three, four, or five-year primary term comma for so long as a well is producing. If you put your well in place in year one or year two, you're no longer holding it by operation of the first clause but by operation of the second. So the lease remains in force either by means of being in the primary term or by means of these other things happening. Correct. Now here, I want to emphasize again, acknowledgment by Chesapeake, we're in the primary term. Neither Chesapeake nor... Now I understand why you're so fixated on this primary term. There you go.  And it's important, though, because I want you to realize that while we're emphasizing a benefit in paragraph 14, there are protective measures here. Chesapeake or its predecessor could have drilled a well, eliminate primary term, then paragraph 14 is of no utility to the landowner. Well, let me ask you this question. I mean, it says primary term of three years and for as long thereafter. So isn't it fair to say they can't get out of the primary term for those first three years? No, no. In fact, that's where 14 doesn't... Isn't that what thereafter would mean here? But you have to remember, if those conditions were met and 14 was not met, three is the general provision that says there's a primary term and then so long thereafter. However, that general clause must be limited by the specifics of paragraph 14. There had to be a reason for putting paragraph 14 in this lease. If Chesapeake's predecessor, Anschutz, just wanted to make it absolutely clear, we're buying a three-, four-, five-year lease and we don't have to do a thing, you would not have paragraph 14 in this lease. Why wouldn't 14 be there so that if somebody else was offering the landowners a much better deal because all of a sudden something wonderful was discovered there, then Chesapeake could keep on leasing but would have to pay the much greater amount that a third party would be offering to pay. But see, literally, Your Honor, in the absence of 14, their lease would be in place and you would only be able to put a top lease on that. A new lease wouldn't mean anything because they would have that term. But by providing in paragraph 14 for a mechanism, I don't care the nomenclature you give it, the price escalation, the vendor protection clause, whatever the case may be, they provided, Anschutz provided expressly in there, that if during that primary term an offer acceptable to the landowners is received, they can then accept that but only after following the process for right of first refusal. And the record here for our clients is absolutely clear. We follow that process to the letter. We obtained these bona fide offers. We submitted them. All of that is in the record. I think it's undisputed that you follow the process as you understand it. They just dispute the process. So in my last couple of minutes, I'd like to then look at the language. We submit to you that we are not adding anything or suggesting adding any clause to paragraph 14. In fact, we're asking for the literal reading of it. It's interesting, though, when you look at the appellee's brief, for instance, on page 24 of their brief in case number 4457, they purport to summarize how paragraph 14 works in their mind, trying to basically oppose the chart that I devised and have in our brief. And they start out by suggesting to you that paragraph 14 works by saying, during the primary term the lessor presents Chesapeake with a bona fide third-party offer to lease the oil and gas rights for a period beginning after the expiration of the primary term. Of course, that's what they want this court to believe, but that language is not anywhere in paragraph 14. It would have been simple. Yeah, there's the word termination, though, or cancellation. And your Honor, that's fine. Termination doesn't need to be in there. When you look at the language that is so clear, what is to happen? It uses the word shall twice. Yeah, but, you know, I think there's a little bit of a difference. It's not you shall consummate this thing or whatever. I mean, one of the shalls, at least, is you shall have 30 days. Correct. It's just, you know, you shall have a certain amount of time. To match, to express its agreement to match. Right. I understand that, but it's not you shall match. That would have been better. That's what you're reading to me. You shall match. If you don't, it's over. It does not say 30 days to advise whether or not you are going to match. It says to 30 days to advise of your agreement to match. And then to proceed immediately, not just to consummate, not to just bring it to some fruition, but to effectuate the consummation of that transaction in the new lease. Doesn't that just mean signing some paperwork or something? We believe it means bringing that new lease to actual fruition. The only way you bring that new lease to fruition is recognize that the Anschutz lease falls away as a function of the leverage. People on other properties that aren't subject to this, don't they effectuate the consummation of top leases all day long that won't take effect until after the expiration of the extant lease? Common practice. So, I mean, that language doesn't mean it must take effect immediately. I realize the time is getting short. I need to let my colleague come up. But I put in the record examples of language that is used in the industry to deal with the scenario you're talking about, Judge. And those clauses say in them that it's for a lease from a bona fide offer for a lease from a third party that takes effect at the end of this lease. That's how easy it is. If you want to draft that type of clause, you can do it. It's not here. This clause doesn't express it. We can't read it in, and I don't think anyone should infer that intent. Okay. I understand your point and your distinction. I do need to defer here. That's okay. I have one other question about effectuating the consummation of the transaction and the survival of said transaction through any statutorily mandated right of cancellation thereof. What is your understanding of that? Well, Ohio does not have a particular statutory mandated process that would be applicable there. I believe that language may have been applicable for other states in which the Anschutz lease was used. I can tell you, though, I believe that clause reinforces the fact that the parties knew full well that if there's a bona fide third party offer that comes in acceptable for the landowners, Chesapeake has its 30 days to advise if it's matched. And it either does or it doesn't. But that transaction gets consummated, whether it's with Chesapeake or with the third party. And that protective sentence there is meant to reinforce the fact that that transaction is to survive any requirement to file anything or record anything to clear title. Appreciate your time. Thank you. May it please the court, my name is Kristen Moore, and I represent several of the appellant landowners in this case in the Kane versus Chesapeake matter.  I think the Chesapeake wants this court to interpret these leases as it wishes Anschutz had written them instead of applying the plain language as it was actually written. Your Honor, you asked, isn't this a top lease and doesn't this happen all the time? And it is not. I didn't say that. I wasn't suggesting this is a top lease. I was saying, well, in any event, go ahead. I think the Chesapeake wants this court to interpret this provision as permitting a top lease. And that is not the language. As Mr. Matthews pointed out, a traditional top lease provision would include language that would say it is effective only upon the termination of this lease. So that is a distinction that is not in this case. There is not language. Chesapeake doesn't want this to be a top lease. I mean, that's disagreement, right? I mean, they're the first ones there. I'm not an expert in this by any means, but top lease comes later, right? Well, they want the third-party offer to be interpreted as being effective only after their lease is over. That's usually the way leases work, right? One ends and then the next one starts, usually. Under this scenario and under this language, we believe this permits the new lease to become effective immediately. Help me understand how Anschutz or Chesapeake would obtain the benefit of their bargain if, in fact, anyone could come in immediately and have a different lease. That's a great question. This provision was included in the contract, so when this lease was bargained for, they knew that Paragraph 14 existed and they knew that the landowners had a right to do this. This isn't necessarily a concept that is foreign in contract law. People purchase options all the time. People spend money to buy the right to tie something up and that in the event someone else makes an offer, they have the right to match or to not match. So by inserting Paragraph 14, they knew this was part of the deal. They knew there was a risk that another third-party offer could come and they would have to match it or not match it. But they paid in advance, right? The delay rental was paid up front. That is correct. So why would a company pay what you call the delay rental in advance? It's a nominal. For a three-year term and yet it could end after one month. It's a nominal amount, the delay rental is. How much? We're talking dollars per acre. For my client, it works out to about an average of $17 per acre. The total amount paid? For the signing bonus, the total amount varied between $500 and $1,000. So we're not talking about a lot of money. I guess if I had to analogize it, it's maybe comparable to, I believe Mr. Corrado used kind of a guaranteed price provision, I would say maybe an adjustable rate mortgage scenario. You buy up front, you pay less up front, knowing you have an obligation to match market conditions. And it doesn't work out to be a bad deal for them because all they have to do is match the market condition. If it's a bad deal, they won't take it. If it's a good deal, they'll take it. They are getting what they bargained for. What if they come in and set up a bunch of equipment and so on and start investing in exploration? Maybe the exploration itself hasn't started. And let's say we're within the first three years. And so then all that investment just goes out the window as soon as some other person maybe hears that they found something and makes an offer that, you know, anyway. Well, I think that's exactly the point Mr. Matthews was making. As soon as they begin operations, as soon as they fulfill the very purpose of this contract, they're protected. Well, let's suppose you're mistaken about that, okay? Let's suppose the word thereafter in paragraph 3 means after the three years. And I understand your argument, but if that's not right, then we do have this practical dilemma. Well, it will cost them more, but they won't lose their investment because, again, we're not asking them to give it up completely. We're only asking them to meet the market condition. So, again, it's still worth that money. We're not extorting anything beyond what the mineral rights are worth at the time that that third-party offer was there. And this was their lease. Well, again, I don't know your business as well as you folks do. But, I mean, why couldn't you have another company waiting in the wings, kind of watching to see which wells hit, and then you could come in and overpay to some extent relative to the lease market because you don't have all that exploration cost. And then Chesapeake is asked to match an overpayment. Plus, they've already had the investment cost. At that point, it becomes a lot more expensive for Chesapeake just to hang with this lease than it would for the sort of vulture company, right? I guess my response would be twofold. And the first is that it is my understanding that it is the standard in the industry that once you drill, you are protected, that that is the way oil and gas operates. And I doubt that we'll have a disagreement on that point. Are you protected if you drill, or are you protected if you have a well capable of production? I think as long as you're conducting operations is what the paragraph actually states. And which provision in this lease protects Chesapeake under those circumstances? As Mr. Matthews was discussing, that falls under the paragraph three of the lease term. But explain to me, just briefly reiterate it. The language is different. You have a primary term, and for as long thereafter, as Judge Catledge pointed out, as operations are conducted, or for as long as a well capable. It sounds like you've got a primary term, thereafter operations, or right now a well capable of production. That's correct. So once we have achieved the purpose of the contract and we have a well, then they are protected. But they're not protected, but Chesapeake is not protected while it's conducting operations and looking for... The plain language of the contract that they prepared permits a third party bona fide offer during that time frame. That is correct. That is the language that they have prepared, and if a plain and literal reading of that language requires that result, we're talking about when should this third party bona fide offer become effective. And the concern that Judge Adams had was he felt it should not become effective until the end of the lease term. The plain language, I believe, prohibits that interpretation because it requires not only imminency in terms of promptly providing, having 30 days, immediately thereafter, but it also requires them to take cooperative steps necessary. If all we were doing is accepting someone's offer and letting the lease run its course, Chesapeake wouldn't have to be involved. We would not need them. Cooperative steps imply that we need them to accomplish this transaction. We only need them if it involves their lease. The next clause also reinforces that interpretation, and this was something that you brought up, Your Honor, the survival of that transaction through any statutorily mandated right of cancellation. If this third party offer is only effective once the lease has run its course, why are we concerned with the possibility of cancellation? We are only concerned with that possibility if there is a situation where this lease could be canceled by virtue of this provision during its primary term. Well, this provision also applies up to one year after the end of the lease, right? That is correct. I mean by its plain terms. Well, one year after the primary term. No. Within one year from the expiration, cancellation, or termination of this lease. Yes. So the lease is over. And yet it is your position that this provision does not grant a right to them. Instead, it imposes an obligation upon them to accept the other, to match the other offer or else be in breach. How does that make any sense nine months after the lease is over? I believe that this is a mutually beneficial provision. Well, answer my question and then, I mean, how does that make sense? If, I mean, your basic concept of this paragraph is it imposes an obligation upon them, not a right. And if they don't meet that obligation, they are in breach and you can obtain a remedy. How does that make any sense nine months after the lease is totally done? Well, after the lease is totally done, that is a beneficial provision for them because they have the right of first refusal. During the duration of the lease, it's also beneficial to them, but it's beneficial for the landowner as well. But as you construe it, it's an obligation of first, you know, acceptance. Well, I actually construe it as an either-or proposition. They can accept it or they can permit us to proceed with consummating the transaction with the third-party offeror. So it is entirely up to them which avenue is selected and presumably they would make the best business decision based on the price that was existing at that time. Would they be in breach then, though? I mean... Would they be in breach after the... Yeah. I mean, I understand. And that's a thoughtful answer. I appreciate it. It's not just, you know, a one-dimensional... You know, there are two sides to this coin. But the implication would still be there that if they don't accept or they don't match nine months later, they're in breach, which just seems... That's sort of a signal that we're not on the right road here. That's not how I interpret it. I interpret it as their breach is not their failure to accept. Their breach is they're preventing us from consummating the transaction with the third-party offeror. So they can do either to satisfy their obligation. They can either accept and match. That means said transaction is the third-party transaction in that case. The said transaction is whichever is the result of that offer, the match or the third-party offer. It can be either. So they're only in breach when they fail to permit us to enter into this. You had a lot thrown at you in the last 15 minutes or whatever, and you knocked it away pretty well. At the very least, this is an ambiguous provision, and it should be remanded for a factual determination. Thank you. Good morning, Your Honors. Daniel Donovan for the Chesapeake Entities. And as you mentioned, I know I have 30 minutes. I don't plan on using it unless we keep going. Just wait. But what I wanted to do to preface this is I wanted to ask if I could take a few minutes before getting into the questions you asked my opposing counsel to explain what we're doing. I know you've read it, but I believe the structure here is all good. Yeah, by all means. Okay. So I'd like to begin with the lease and focusing on that, because I agree with Mr. Matthews, the Ohio law and contract interpretation is well-known. So paragraph one of the lease provides Chesapeake the right, the exclusive right, to explore for and produce oil and gas from the lessors' property. And what did the lessors get in return? They got two streams of payment, and they are different. The first is they received an upfront payment for all the rent due under the primary term. So they have been paid. They have already been paid at the outset for the rent or the lease of each year of the primary term. That's why it's called a paid up oil and gas lease. That is payment stream one. Are your opponents correct in their characterization that this upfront payment is actually, in the case of finding the resource, is a really small component of the overall money that's flowing to the lessor? Well, it depends. If there's a royalty payment, which is payment stream number two, then it is. I mean, we have people earning $50,000 a month. I mean, it's great. It's a win-win situation. Now, there's some places where we spend money, and we don't find any oil and gas. So then that's all they receive. So it depends on each one. It's not a huge amount of money we're talking about, though, I gather. Oh, well, it depends, right? For the upfront? No, it depends. It's these leases back in this time period, when the market was different, it's lower than people who we've signed up in the last three years who are getting a lot more. And as we say in the brief, it's not for your interpretation, but we believe that's why these cases, that's why these fees have been brought. But I don't agree across the board. Okay. It's a small amount. But I think you hit on a point, which I want to get to, is there's that second stream, the royalty payment stream, which is really, at the end of the day, the big winner for the royalty owner and us, because that means Chesapeake's making money, so it's the royalty owner. So that's paragraphs one and four, and that's important, and I hit that mostly because we have paid the royalty owner, and the lessor has leased their oil and gas rights. They have no other oil and gas rights to lease. They've leased them. And is the royalty payment a standard amount in all of these leases? They vary, Your Honor. Typically, I'd say it's an eight, but sometimes it can vary. So then, Your Honor, we get to the different sections that we're really here about, which first, paragraph three, which is defined. I know you've spoken with opposing counsel, but this lease shall remain in force for a primary term of three years in the lease I'm looking at. I take a different position. I think it's a plain reading. That is going to remain in force for three years. That's the plain reading. It's not subject to any exceptions. But it says, and for as long thereafter as prescribed payments are made, comma, or, and then there are two separate ors. If you would explain why you think their reading is wrong. Right. Their reading is wrong because the primary term in the industry, it says as it says, it's three years. Now, you may have, I may have a well on their property within that three years, but that doesn't take it out of the primary term because I may drill a well that's a dry hole. Well, that doesn't mean I drill the well, well, I still have three years to find a well that's going to produce. The primary term, as it says plainly there, is a set amount of years. Well, what if they're focusing on the or for as long as a well capable of production is located on the leasehold? Sure. So what happens is there's a set amount of years. As in most cases, the Chesapeake would want it as long as possible so we have time to look for gas. But then once there's a well, all the parties agree, well, wait, whether the primary term runs out or not, as long as you're producing oil and gas and they're getting paid, it stays in effect. I mean, there's traditional wells in this state that have been around for 50 years. And those leases may be really old, but as long as you're producing oil and gas, they stay. But if you read three and four, and I don't think it's critical to 14, but I do disagree, and I want to be clear, is that the primary term, as you asked, is three years. And then we get to extend it in this one, usually it's the same amount of time, at our sole discretion. We only get to do that once. So that was your point. And so it's still called primary. We've got judicial decisions all over the ballpark on this. You know, what is an extension? Is it still the primary term or is it just the first three years? Let me just focus on ours here. Yeah. Explain yours. Sure. Paragraph four is extension of the primary term. So we are still in, and typically that's a benefit for us. Some lessors strike it out. But here, the leases we have here, we have it. It's a benefit because if we're coming up to three years, we have the right to say, you know, we're just going to pay you again and we get another three years. But that's the hour limit at the beginning. Of primary. Of the primary term. Yes, Your Honor. Quick question about paragraph three again. At least in the version I'm looking at of the lease, we have these thereafters, and for as long thereafter as prescribed payments are made, as long thereafter as operations are conducted. But then we don't have thereafters for as long as a well-capable production is located or for as long as extended by a provision here. And I guess forget about that one. For the well one, does the omission of thereafter mean that you do get out of the primary term as soon as you have a well-capable production? No. The primary term is what it is. They can overlap. We can have a well during the primary term. But the difference I submit there is there are two different clauses, right? We could be searching for oil and gas and not yet have a well. But other provisions of a lease require us, if it's beyond the primary term, to do it continuously. So let's assume the primary term is over and we're searching for 30 days and then we stop for a year. The lease runs out. That's why there's ones that we're required to keep going. We can't hold it just by once a year stepping on the property. But under your interpretation, that would mean that if you've got a well that is actually producing this preferential right to renew, well, it enables the landowner to come in during your well-capable of production activity and bring in a counteroffer. Right. For the end of the lease. That's exactly why their interpretation is so absurd. Except for you. The problem for me then, counselor, is the last version. Or this lease shall remain in force for... list, list, list. Or for as long as extended by provision herein. You can make your lease go on forever. Well... So how would they ever have... I mean, how can you have a fair reading of a document in which there's impossibility? It's not impossible. And it is unusual, but it is not impossible. And here's why. Okay. Explain to me from their viewpoint. Sure. Not, you know, because you have the call. And if you make the choice to extend these provisions, then can you make it impossible for them to exercise 14? I cannot. And let me explain more. What we're dealing with in this case is simply people that are within the primary term. So it's within either the first three or the extension. If we're searching for oil and gas, so we're beyond the primary term, we have to do that continuously and not have a break for 90 days under other provisions. If I stop within that period and that's beyond, they can still make that paragraph 14 offer, right? As soon as I stop, that second offer can take effect because my lease will have run out. The third way is if I have a well on the property. And this would be more traditional of the old wells here in the state. At some point, wells run out. And what happens, and this happens all the time, it's usually people looking just to capitalize, they'll say, I will enter a top lease with you because I think there's something still left there, and it'll run out when Chesapeake's runs out. Let's assume my lease runs dry and Chesapeake doesn't do anything any further. They then would have to give me notice, me, Chesapeake, and I would say, I'm done with this well. And then paragraph 14 comes into effect. There is never a situation in which paragraph 14 is not available. And if you say, I'm not done? Then they can enter it with the other one. But it doesn't take away my current lease rights. That's what I wanted to come back to. Are you saying that paragraph three says that you, Chesapeake, if you have drilled a well and it's capable of production, that you get to continue the lease without having to match terms under 14? Correct, even under their view. My view is the lease continues and it cannot come into effect until my lease rights run out. Paragraph three gives me that right. And I wanted, if I could just pause here for a moment, because I've heard two different things from counsel, and this is new, and it's certainly not words in the lease. They know they have a problem with their interpretation, so they're trying to give us protections, which we appreciate, but we don't think it's the provision. One is they say, if you drill a well, you're fine. Paragraph 14 doesn't apply. It doesn't. We believe if you interpret the lease as a whole, that's true, but it doesn't say that. And then the second counsel said, well, if you start operations, then it doesn't come into effect. Well, none of those words are in there, and that shows the real problem with their interpretation. Because let me spend a moment on drilling a well is not something that happens in a day, okay? Obviously, the market knows Chesapeake Energy is in Ohio. We're happy to be here. We think it's a cooperative process in which we're developing oil and gas, and royalty owners make money, and we make money. But when we're in a neighborhood, people know we're doing seismic activity. We're looking for oil and gas. And the royalty owners talk, and they should. And they say, well, geez, Chesapeake's looking like they're going to put a well on my neighbor's property. Well, at that point, I haven't drilled. I'm probably not going to drill for another six months because I've got to get permits. I've got to finish my seismic. I need to line up water. I need to get drill rigs from Pennsylvania into Ohio. And then finally, I might drill the well. Well, in the meantime, if this provision would do that, I would lose everyone. They would figure out as a matter of economics, what is the price I can get that upfront payment to to force Chesapeake to pay? And I raise that just to raise really the impractical part. Not that I want to get back to what the words say, but the impracticality of that interpretation of paragraph 14. That is not titled a most favored nation, an escalation clause, an option. It is titled a preferential right to renew. And when I get to the language, that matters. But I guess to conclude on the structure, so you have paragraph three is the primary term, which is a set of years or as long as we have it, as we talked about, operations or a well. Paragraph four, titled extension of the primary term, gives us a one-time right. So under the lease we're looking at, the lease term has three years and we can extend it by three years. So we have six years to find oil and gas. And then paragraph 14 at the end is entitled the preferential right to renew, which I'm going to turn to. And against that background of those three periods, that's what we went to Judge Adams with. And I want to be clear, this is not what we asked Judge Adams to rule on in a declaratory judgment, is that the lessors do not have a right to terminate the lease pursuant to paragraph 14. And that is what Judge Adams found. He said the plaintiffs are not entitled to terminate their paid-up oil and gas leases during the primary term pursuant to paragraph 14. There are other cases out there that we may have other claims, but that is all Judge Adams ruled on and that's all we asked him to rule on because that's the big issue in this case. And although it wasn't talked about, I'd like to briefly just summarize what the district court did hold because he did this after receiving seven briefs and 110 pages of briefing, is that there was a preferential right to renew provision, doesn't provide the lessors a right to terminate the leases during the primary term. Instead, the district court held paragraph 14 provides Chesapeake a right to renew its oil and gas rights beyond the primary term if it matches. And the district court held, which I think you see through the different briefs, the varied and inconsistent proffered interpretations weren't consistent with the plain language of the provision, would require added language to the lease, as we all know is not proper under contract interpretation, and in our view is at odds, as Judge Adams said, or in my view conflicts, and primarily conflicts with paragraph 3 and 4, which uses the term shall for the period of time, at least for the years of Chesapeake, and thus we submit they should affirm. Well, I mean, but you would have to admit that this right of renew goal is very awkwardly worded, you know. I mean, it could be much more clearly worded to mean what your opponents think it means, but it could be, I mean, the phrasing of, you know, you shall promptly provide the lessee in writing, I'm sorry, you know, or advise lessor in writing of your agreement. It's awkward, you know. I mean, you would expect as to whether you agree or as to whether you match. Two points there, Your Honor. I respectfully disagree. First, I don't think the language is I want to get to that, but two, I don't think it is, especially when you look at the lease as a whole, I want to address those in turn. I actually retyped the provision, and if you look at it, it's three sentences. I know it's hard in these lease forms sometimes. Yeah. But it's three sentences. And Judge Adams respectfully did a very nice job of walking through each of them. And the first one, all the first one does, it says when the lessors are obligated to provide notice to my client, Chesapeake. That's all the first sentence says. It's long, but it says during the primary term or within one year, even after this lease terminates, the lessor receives an acceptable bona fide third-party offer to lease the leasehold. Lessor, excuse me, this is the key, lessor shall promptly provide the lessee in writing of all the verified particulars of such offer. That's all sentence one provides, and that's what Judge Adams found. Lessor has an obligation to promptly provide. Then the second one says once they do that, the lessee, Chesapeake, has 30 days from the receipt thereof to advise lessor in writing of its agreement to match said offer as to all terms and considerations. We have 30 days to match it. Immediately thereafter, lessor and lessee shall take all cooperative steps necessary to effect the consummation of said transaction and the survival of said transaction through any statutorily mandated right of cancellation thereof. Our interpretation, Judge Adams, is if we agree to that, we have 30 days, or within 30 days, we have to sign it up, and why is that? Well, the reason is we can't say, yes, we agree, we'll sign that with you later. No, if we want that lease that's going to come into effect later, we've got to sign it up now, and that's exactly what has to happen. Because they'll lose the other opportunity after. Yeah, because usually there's time on the time, right? Someone will come in and say, if you sign within the next 60 days, we'll agree to have this lease that comes into effect later. If I say, yeah, I'll get back to you, I'm not going to sign it, they may lose that right. And Judge Schrench, you asked about the last clause, the survival. It doesn't apply in Ohio, it's for New York, but let me explain what it's for. It's like when we take out mortgages, you know how I can go back and say, oh, jeez, I don't want this mortgage. It's a cancellation right under federal law. It's the same thing under certain states because it's a property right. Under New York, you have to set for any statutorily mandated right of cancellation. What that says is the lessor and lessee have to make sure we get through that period. But it's not applicable in this case, the parties agree with that. And then the last clause is any lease or option to lease the leasehold in whole or in part, granted in contravention of purposes, shall be deemed null and void. So that's, it's three sentences. They have to provide the offer to us. We have 30 days to tell them if we want it. And as Judge Adams found, assume we say we don't. They can sign it with the other party. The issue is, I think you raised it and Judge Adams definitely did, is okay, when does it take effect though? Well, it only takes effect at the end of this lease and why is that? I really come back to where I started. It does because of paragraphs three and four. That is, the lessor has already leased oil and gas rights for these periods of time. We've paid them for it, we all agree to that. And it's not... You haven't. Go ahead. Please. You haven't. You've paid them for the first three-year term. Then you have an opportunity to pay them for the second three-year term. And then you have an opportunity to pay them all of these fairly nominal payments to be made to hold the property. If we want to look at it from both sides... I'm not sure I understand the last part. We basically, we pay them up front for paragraph three, three years, and then we have the opportunity at our sole discretion to say, and not everyone agreed to it, it just happens to be these lessors in this case, is we get to take three more years, per se. By the end of that, if I haven't put a well or I don't have operations, I have no other way to extend this lease. But if you have put a well and if you have operations, the lease goes on as long as you're continuing in that activity. Yeah, there's two different... I have certain obligations I can't stop for a period. But if I have a well, everybody wins. That's the ultimate goal for both Chesapeake and the landowners, I think I heard Mr. Matthews say at this point. That's correct. What is 5A? 5? 5A, payments to lessor, delay, rent. That is, if you look at... That basically is the payments per year. And if you look at the last bolded sentence of that, that's what makes this paid up. It's saying we, Chesapeake at that point, Antrips, paid all of these per year. Because the delay rental is, okay, I've rented it for three years. I'm not doing anything the first year. If I don't do anything, I have to pay you the delay rental. Well, under these, because both it helps the lessor, or the royalty owner, and we don't want to miss a payment. We just pay them up front. Well, but I'm trying to understand how long that can last. Because it says if operations for drilling are not commenced, not done, within 90 days from the effective date, lessee shall continue this lease in full force and effect, making payment to the lessor at a delayed rate, $5 per net mineral acre per year, payment to be made annually until the commencement of a well. All right, but that goes with paragraph 3. I mean, we only have the right to do this with the lease term. And during the lease term, if I drill a well, I don't even have to pay that. No, okay, the 3-year primary term, the 3-year extension term, and then there's no such thing as a delay payment? Under unique circumstances, let me give you. So assume, and this isn't an issue in this case, but assume I have a well, and it goes dry, or I plug it, and then I don't do anything for a while. It gives me, I believe under other provisions, one year to kind of get it going again, and during that period I shut in, I have to pay that delay rental. But, Your Honor, that's not an issue in this case. Because, well, your opponents say this gives you an indefinite right of extension. I didn't agree with them to say that, and it certainly doesn't. I mean, it just doesn't. 3 and 4, and this is where at times, Your Honor, the lessors take each clause, and they try to take them out of context. This is an entire lease. Our lease term, as is traditional, is defined in 3 and 4, as we talked about. And 5 is all about what do we have to pay during that lease term. And delay rental is one, if we have delay. If we're producing oil and gas, then you go to B, and it's royalty. Okay? So I don't believe that's really the right thing. But what do you pay under the lease term that authorizes a continuing lease for as long, under 3, for as long thereafter as operations are conducted on the lease hold in search of oil, gas, or their constituents? Yeah, I believe, and I need to look to the other provisions. It is a delay rental. Well, if that's a delay rental, as long as you're doing some sort of operation, it can go on indefinitely. Well, but there's other good faith grounds, and we have to do it continuously. So there's another provision, and I can look inside it. But basically, if we stop for 90 days, the lease goes away. Yeah, but if you don't stop for 90 days, you're conceding that it can go on indefinitely. In theory. Well, it's their land. The theory for them is the key. Well, I know, Your Honor, but that's raising a different claim, and we've had different cases, which is, are you in good faith actually operating on my property? That's not this case. I mean, that truly is a different case. What this case is about is, how long can you continue to work and maintain your right to hold my property from some other usage in which I can make money from another individual? I mean, that's the key to them. They don't care right now whether you're going to be arguing about good faith commencement or how long. What they want to know is, what's the worst case scenario? How long can you hold my property under this lease so that I can't go to somebody else and get paid? And it's obvious the implication. You've got, I assume, some sort of aquifer-like lease underneath, and you've got the ability to consolidate, unite these lands. So if you're pumping at one corner of that aquifer and they're at the other corner, there can be no oil left by the time somebody wants their property. Well, I don't think under current unitization law in Ohio, and actually, Your Honor, it's the opposite of what they're doing, okay? This lease provides very set times, and this happens all the time. What they're trying to do is to get upfront royalty payments that people got paid in 2011, 12, and 13 rather than the deal they cut. And what this is actually doing is holding us from drilling wells, okay? This litigation is calling us delays in drilling wells. I have a pretty simple question. What is, under your interpretation of this lease, what is the maximum time you may prevent them from entering a lease with another seller, with another lessor? I think to answer your question, I'd have to put a well on their property when that well runs dry. Because if I don't do anything, it's going to run out in six years under our... And if you do something that you don't find a well or you don't pump that well, it can go on as long as you're doing something. In theory, Your Honor, but I'd have to be doing something,  is the operator doing something in good faith to search for oil and gas? Okay, so under that hypothetical, it is theoretical, but I don't believe... But it's possible. It's possible, but I don't believe it's practical. Where is the good faith provision? It is in paragraph 12 in the continuing operations. There's also Ohio case law on this. Is it an implied good faith obligation? Some have it expressly. I know it is implied in Ohio. What does 12 add to three dozen with the clause about continuing operations? Well, it defines it further, and it says... And again, this goes to a stretch. It says, if at the expiration of the primary term, which again shows, in my view, the primary term's a set number of years, whether I'm doing anything or not. There is no production of oil or gas or condensate on the leaseholder, lands pulled or utilized, but the lessee is engaged in operations. Because what happens sometimes, assume we're clearing the well pad to drill the well, but we haven't drilled it yet. Reworking goes on. The lease shall remain in force and its term shall continue for so long as such operations or additional drilling goes on are prosecuted with no cessation of more than 90 consecutive days, and if any such operations result in the production of oil and gas, as long as thereafter there is production or the term of this lease is otherwise extended. So it's defining when and what we have to do. And in this lease, it doesn't seem like it's expressed, but there is an implied good faith under Ohio law. Could they perhaps be wanting to negotiate a new lease with someone who's going to pump more out, and that could be the problem that you, for whatever reasons, maybe your judgment about the market for gas right now is that it's not as high a rate as it's going to be in the future, so you want a delay, and they can get a deal with somebody else to pump more out. Is that part of the problem? I don't believe it is. I mean, there's one. The legal reason is, look, the deal up front is we basically, in most cases, get the two three-year terms. We have the exclusive right. We fought that. We now get to try to find that. What really happens, Your Honor, is this is not, in most cases, other big companies, okay? This is some other where they're just looking to jack up, and they want to lease it right back to us, okay? We are the biggest oil and gas producer in this state. We're at least drilling. So I don't believe that is part of this. Part of this is that it's undisputed that they signed these leases when the up-front payments were lower than they are in late 2010, 11, and 12. It's public knowledge, too. We paid a lot to Anschutz. We didn't pay what they paid. Anschutz went in early, signed up these leases, and then sold them. And if you look at 5L, it addresses that. 5L says,  that oil and gas lease payments in the form of rental, bonus, and royalty can vary depending on multiple factors, and this lease is the product of good faith negotiations. And then at the end it goes on, Lesser further agrees that such payment terms and bonus payments are final, and Lesser will not seek to amend or modify the lease payments to seek additional consideration. We believe that's exactly what's going on, and Judge Adams referred to that. Will not seek to amend or modify the lease payments. I mean... Seek additional consideration. And this is the reason why the argument that this is a most favored nation clause cannot possibly be, because as Judge Adams found, 5L is not permitting that expressly. What about 5K? It says, it's agreed that, last sentence, it's agreed that this lease shall never be forfeited or canceled for lessee's failure to perform, in whole or in part, any of its implied covenants, conditions, or stipulations, and et cetera, until it shall have been first, finally, judicially determined that such failure exists. Does that just not apply here because of the limitation of implied covenants, whatever that is? Yeah, we don't believe it applies here in this case. So somebody basically can say, you missed the payment by a day. I mean, it would help you if this applied, right? Because, well, I don't know. I'll let you argue. I think it could protect us if the court had found to the contrary. Assume Judge Adams found they were entitled to terminate the lease. Then we are protected because they couldn't do it until it's finally judicially determined. But as he found, I'm not saying it doesn't apply ever. I just don't think we need it here. I was curious. Let me turn to two other points in my remaining time. You were pressing and saying I wouldn't use all my time. Thank you, thank you. My mother said I talk too much. Two main points, Your Honor. Termination. Judge Adams has this, but I think it's critical under the Altman Hospital, under these courts' decision contract. There is nothing in here that says they can terminate. They've been creative. They have a lot of interpretations. But termination is serious, and it doesn't say that and you'd have to add words to do that. And we hit this in our brief, but we believe the title that they've called a lot of things, the preferential right to renew, it's a benefit for us. We didn't get this from all of our lessors. Some struck it out. We have one plaintiff in this case who has one lease with it and one lease where they struck it out. Okay? But that's a benefit for us. I agree it's a benefit. Is that part of the record? It is. Well, it is in the record. I don't need it. It's okay. That lease is not. We didn't put all the leases in. So we can't take account of that. I don't think you can, Your Honor. Okay. I wasn't calling you out. I was just curious. But the title does matter because they've tried really hard to call it everything else, and the preferential right to renew, we agree it's a benefit for us. We get the chance before someone else, if someone else thinks there's something good, we get a chance to match that after our time runs out. And especially, where does that show up the most? I think it was your question. I've raised this in my brief. It's even one year after the primary term because Mr. Matthews says, well, it's not a top lease. No, it's a top lease plus in our view. Okay? We didn't always get it, but we get it. A top lease is usually just during the primary term because it comes into effect as soon as the oil and gas company either doesn't develop or misses the deadline. This gives us even a year after. So we believe the title matters, and why can you consider that? That's the Ohio Supreme Court's dominant opinion that did exactly that. Well, Your Honor, we believe that our interpretation is the only reasonable interpretation if you read the plain language and the lease as a whole. And I come back to where... Let me understand why we don't have an ambiguous document. Sure. We've got your interpretation. We've got their interpretation. We've got Kuntz's interpretation. We've got Green's interpretation. We've got other courts opining, and they all say my interpretation is the only reasonable one. Isn't that a problem for ambiguity for you? It isn't, Your Honor. And first, let me start with ambiguity just to kind of level set us. As you know, in the Sixth Circuit, we cited the aerial decision. Just because they offer a different interpretation doesn't mean it's reasonable and make it ambiguous. I actually believe it's... But we're talking not just about your opposing counsel offering it. We're talking about other judicial officers determining it. Well, and in that case, and I'm glad you raised that because I ran out of time, but I wanted to address this. This is primarily there's been... You've got a new lease on it. I do. I do. Not only are you talking about a new lease on it, but now tell your mother you're on it. Okay. Good job. But we have Judge Adams' decision that we're all here for. Right. There then was Judge Marcus who ruled in two state court cases brought by Mr. Corrado in state court. And then we have the Green case. And it's Coons? Coons and Conego is the same decision. Okay. So it's two different counties, but they've been coordinated. In the Green case, I respectfully... It was a summary decision just saying I'm denying. Yeah, but what it said, it made a conclusion. I know he didn't explain it, but when you say, I'm not taking this up, I'm not granting your motion because this is an ambiguous document. Well, the judge said there are facts in dispute, although I will tell you, Judge, they're curious in the sense of both Mr. Corrado and I both agreed and represented the judge. It wasn't ambiguous. We're not introducing any extrinsic evidence, and he didn't identify which facts were in dispute. So I guess my point is I don't believe that persuasive evidence on ambiguity. But then we come to Judge Marcus' decision. And that case is a... So in that case, the lessor is a plaintiff in Chesapeake. And there's more than just... In that case, more than just what we saw the declaration is on termination. Okay. But if you look at page 12 of the slip opinion, what Judge Marcus found was, and I'm just reading the key part, but he says, the replacement lease, that top lease or the additional lease, cannot interfere with Chesapeake's rights to maintain inactive speculation during the primary term or its rights to maintain continuing operation. He found on the key issue the same thing as Judge Adams, and we know that because actually we weren't even... The plaintiffs appealed it. And there's one other thing that's critical. So he found with Judge Adams, this court, that being Judge Marcus, also agrees with the Catlett decision that the phrase immediately thereafter in paragraph 14 refers to the time to complete all documents or arrangements which effectuate the consummation of said transaction and not to the effective date of the replacement transaction. So for what's before you, both those courts are the same. Now, there was where Judge Marcus then said paragraph four means something else, but actually, interestingly, on appeal, the plaintiffs agree with us that it means an extension of the primary, but Judge Marcus just got that one wrong. Has my case been decided on appeal? Hasn't been heard yet. But my point there is on the issue before, Your Honor, Judge Marcus and Judge Adams are the same, and I agree Judge Portione is not, but I don't believe it's persuasive just because he didn't explain why to you. Thank you very much. Thank you very much. We're done. Thank you. May it please the Court, I'm Gary Corrado on behalf of Appellants, and I represent some of the appellants in the Chesapeake v. Catlett case, and since we ended with ambiguity, maybe that's a good place for me to start. At a minimum, this provision is ambiguous, and the intent of the parties needs to be determined at trial. And the reason that I say that is we have Chesapeake's interpretation, and that happens to be the interpretation that Judge Adams adopted. You have the appellant's interpretation. You have Judge Marcus's interpretation in Coons v. Coniglio, which doesn't adopt Chesapeake's interpretation, doesn't adopt the appellant's interpretation, and doesn't adopt Judge Adams' interpretation of paragraph 14. In fact, there are several places where Judge Marcus expressed and said, I reject the reasoning of Judge Adams. But isn't it true that we don't measure ambiguity by these sorts of external criteria, i.e., by whether people disagree? I mean, don't we measure ambiguity by taking a look at the document, even a complex document, even a document that isn't particularly well-drafted, and looking at the structure and the language of it, and then coming to a decision whether one interpretation is clearly better than all the others? And even if a bunch of judges haven't seen that, I mean, we look at the document to determine ambiguity, not at all this clamor around it. Well, Your Honor, I think that that is the starting point, but I respectfully disagree that the standard is, is one interpretation much better than the other. That's just my paraphrase. I understand. But my point is that the mere fact that you all disagree and that judges might disagree doesn't mean it's ambiguous. What makes it ambiguous is, do the appellants and the appellees both offer plausible and not unreasonable interpretations of that provision? And that's what, in order for the court to determine that it's not ambiguous, it's got to either find that Chesapeake's position is completely unreasonable and implausible, and that cannot be interpreted that way. I'm not sure if that's the standard. But, and in fact, in this particular case, there was evidence presented by way of after David by landowners and a land agent trained by NHS's agent, Mason Dixon, whereby the landowners, which is the real test, sat down and read this paragraph and what did the plain language mean to them, and how was the plain language of the paragraph explained to them by the land agent? And they all... All right, let me ask you a question. Okay. I mean, first of all, we're not just looking at that paragraph, we're looking at the whole lease. Looking at the whole lease, and I just want to be candid with you about my... at least one serious concern I have with your position, which is that by implication, i.e. not expressly because 14 doesn't say you may terminate and so on, merely by implication, it seems to do an awful lot of damage to a number of other paragraphs. It's like a wrecking ball that would go through a bunch. And I understand that your position, and it's been very well stated by you and Mr. Matthews and Ms. Moore, that, you know, this 14, when 14 is triggered, it's more specific, and therefore it governs and trumps all these others. But, you know, it does give me pause how much trumping would be going on here. I mean, we have paragraph 1, you know, lease exclusively to the lessee. Well, that's out the window once somebody shows up and makes a better offer, even a year in. And I'll just write the page back, and I'll let you... I don't mean to, you know... No, that's fine. I really want to be candid with you about my concern about your position. Okay, so you got paragraph 1, exclusivity. Paragraph 3, shall remain enforced for 3 years. That is not going to happen in many cases under your interpretation. Paragraph 4, right of extension, which is in their sole discretion. That goes out the window if they don't match. Paragraph 12, conducting operations, remains in effect. That would seem to go out the window. So we have at least 3 or 4 paragraphs that merely by implication... I mean, an implication in your view of paragraph 14 is all that stuff goes away. I mean, shouldn't that give us pause that something that doesn't even say terminate could do that? I think that, first of all, when you talk about paragraph 1 and the exclusivity, of course, paragraph 1 doesn't put a time frame on that exclusivity. The exclusivity, it's only for as long as the term continues. When you talk about paragraph 3, it says, shall remain enforced for a period of 3 years. And I think the at-least said, well, that's a guarantee. Nothing can be done about that. It absolutely has to be in effect for 3 years. But that's not the case, and not only just because of paragraph 14. Paragraph 17 of the lease allows the lessee at their election to walk away and terminate it at any time. So that shall... So it's actually, it shall for as long as, I guess, the at-least want to maintain the lease. That cuts both ways. That's an express provision. Yours isn't. Well, we think that it is, Your Honor, and I'll explain why. Because even though the word terminate doesn't appear in the paragraph, the effect is the same. And I'm going to tie it in by talking quickly about the title, because I only have a few minutes, and I think this is very important. The title is Renew, and the at-least rely on this Renew, Renew. But if you look at their papers and you look at the briefing, when paragraph 14 is operated, this lease is never renewed. It's a new lease, either with Chesapeake or with the third-party offer, because what it requires is that all the verifiable, the lessee shall have 30 days from receipt thereof to advise lessor in writing of its agreement to match said third-party offer as to all terms and condition, and consideration, and then immediately thereafter. You're saying a renewal cannot change the term? Well, I'm saying it's not a renewal, because now it's going to be a new lease. It's going to be a new lease to Chesapeake. A new to just new. That's correct. Something that takes the place of the other. And so the effect, even if Chesapeake... I could judge more on that. But even if Chesapeake... We're doing another new. Right, right. That's great. But even if Chesapeake exercises this right, the underlying lease goes away. There's a new lease with new terms and new considerations. And one of those terms may be... The terms are not restricted. And terms of a lease... Those are commencement date, term of the lease, payment of consideration. And so what this says is that they shall consummate the transaction. Well, okay. What about paragraph four? That goes out the window under your view. But they bargained for that, Your Honor. They bargained for it, because they wrote paragraph 14, and they wrote it the way they wanted to write it. And they continue to put into this... And I'm running out of time. Real quickly. They continue to interject in this, this time limitation. It has to be something after the lease. It doesn't appear there. And the real problem is that to adopt their interpretation renders paragraph 14 meaningless, because, as Judge Strach said, that delay rental, they can pay that forever. You have the primary term, three years plus three. They can either then drill a well, or if they don't drill a well, for $5 an acre per year, if you look at paragraph 5A, they can hold this forever. Now, I know they said, well, that's not the case. It's not a limitation. There's no limitation in that paragraph or anywhere else in the lease. They can hold it forever. Isn't there a good faith obligation somewhere? We were told paragraph 12. There's an applied covenant of good faith sometime down the road. But what it does is, there's no reason for them to ever match an offer,  they'll pay $5 an acre and continue to hold for some point in time, whether it's 20 years or 15 years or 10 years or whatever a court may decide down the road. And so there's never going to be an operation of paragraph 14. If you adopt theirs, the lease can only go into effect after the term. The other thing it does is, no third party's going to make an offer, because they have no idea when and if they're going to have to perform on the terms of the agreement that they've signed. Is it going to go into effect in three years? I understand. Are they going to hold it for 15 years? If there's a well pumping away, then you're probably right. But if there's not a well pumping away and they continue to make delayed rental payments to avoid this other lease or the operation of this other lease, it can frustrate the purposes of that. And I think for all of us, if we want to read it together... It's a low transaction cost to hand one of these over to a lessor though. I mean, why not take a shot? Maybe they do go away, right? And they can prevent it all by if it makes business sense for them in the deal that they cut, they can match the terms. It has to be a bona fide offer. It can't be some offer out of sky. It can't be something that the landowner makes up. It has to be a bona fide offer. And so when you try to... We've looked at the practical implications for the landowners, which are pretty significant, but what about the practical implications for the lessors? You have the... Under your argument, you can come in at any time during the primary period, despite... It's what Judge Kessler was indicating. The pretty substantial costs that they've entailed to begin... Let's say they haven't successfully gotten a well capable of production, but they spent a lot of money. They've brought their equipment down. They've begun some kind of operation. Give me your analysis of why they would enter an agreement. What benefit of the bargain they get by entering the agreement as you interpret it based on what it's going to cost them to just do their exploration? Well, I think first, they could have, and they had the power to control that with the stroke of the pen. They could have very easily put in that if they receive an offer to lease the leasehold after the expiration of this lease, then we're not here. And they can control that. It was a business decision that they made. And I think based upon the affidavits and the evidence, they made the business decision because it was a market inducement. It was a way to get landowners to sign these leases. So when they hand $10 over to landowners, they say, boy, I don't know if that's enough. Well, wait a minute. Look at paragraph 14. If the prices go up, if the market value goes up, you're always going to be protected because you have the ability to accept that offer and bring it to us. So we either have to match it or you can move forward with the other offer. So where do I... Okay. Where do I sign? I'll take that. So it's a business decision that they made. If they're in operations, but they have not yet drilled a well and a bona fide third-party offer comes to them, then they've got to make the business decision based upon the investment we have in this property. Is it worthwhile for us to match the terms of this bona fide third-party offer and continue what we're doing? Or is it in our best business interest to walk away? Yeah, I mean, that's your understanding of contracting. And they have... I mean, the landowners are not sophisticated oil and gas people. I mean, they're reading this for what it says on its face. Thank you. Thank you. Thank you all for your argument. We appreciate it. The case will be submitted. And would the clerk call any remaining cases?